**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| _____ ) | |
| FRANCINE KERNER, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v, ) | |
| ) | |
| CHAD F. WOLF, in his official capacity as ) | |
| Acting Secretary of Homeland Security ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY ) | |
| 2703 Martin Luther King Jr Ave SE, Washington, DC 20593; ) | Civil Action No. |
| ) | |
| and ) | |
| ) | |
| JOSEPH V. CUFFARI, in his official capacity as ) | |
| Inspector General of the Department of Homeland Security ) | |
| DHS OFFICE OF INSPECTOR GENERAL ) | |
| 1120 Vernon Avenue NW, Washington, DC 20005 ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**COMPLAINT**

Plaintiff Francine Kerner brings this Complaint against the U.S. Department of Homeland Security ("DHS" or the "Department") and the DHS Office of the Inspector General ("OIG") and in support alleges as follows:

**NATURE OF THE ACTION**

1.      Since January 2002, the Plaintiff Francine Kerner has served as the Chief Counsel of the Transportation Security Administration (TSA), a component of the United States Department of Homeland Security (DHS).  Ms. Kerner brings this action against the DHS and the DHS OIG because the DHS OIG violated her privacy and due process rights when it willfully and

1

intentionally failed to comply with the regulatory requirements set forth in its Privacy Act System of Records Notice (OIG SORN) controlling public dissemination of OIG investigative records:   DHS/OIG-002 Investigative Records System, 80 FR 44372 (July 27, 2015), http://www.gpo.gov/fdsys/pkg/FR-2015-07-27/html/2015-18385.htm.   The OIG SORN was published by the Office of the Secretary under the auspices of the DHS Privacy Office.

2.     The Privacy Act was enacted to protect individual privacy interests. A government employee generally has a privacy interest in any file that reports on an investigation that could lead to the employee's discipline or censure. Investigative records often contain highly sensitive personal information, including untested allegations of possible misconduct, ascribed motives that prove to be inaccurate, and asserted facts shown to be erroneous.  As relevant here, the statute bars the DHS, the OIG, and other federal agencies from disclosing a covered record "about" an individual unless an exception applies or the individual who is the subject of the record consents in writing to the disclosure. *See* 5 U.S.C. § 552a.  The statute contains no general exception permitting an agency to disclose covered records to the news media or the public.

3.     On January 8, 2018, the DHS Acting Inspector General (IG) John V. Kelly posted on OIG's website a Special Review entitled, "TSA's Handling of the 2015 Disciplinary Matter Involving TSES Employee (Redacted) (OIG Review or Review), https://www.oig.dhs.gov/sites/ default/files/assets/2018-01/OIG-18-35-Redacted-Jan18.pdf. As written, the OIG Review was designed to absolve a political appointee—Acting TSA Administrator General Francis X. Taylor—of responsibility for his controversial decision to retain in federal service a TSA Transportation Security Executive Service (TSES) Employee with whom General Taylor had a close working relationship.

4.      In shifting blame away from General Taylor, the published OIG Review unfairly impugned Ms. Kerner's professionalism as Chief Counsel, accusing her (and two colleagues) of having "deviated from," "interfered with," "circumvented" and "commandeered" TSA policy and practice in order to provide the TSES Employee with "unusually favorable treatment." These negative terms were chosen to convey to an uninformed reader that Ms. Kerner had acted without requisite authority and for an unacceptable purpose.  As her supervisory chain later determined, that was not true.

5.      Prior to publication, OIG failed to provide Ms. Kerner with an opportunity to examine the Review for accuracy or to submit feedback.  Nor did OIG refer the Review to Chief Counsel Kerner's supervisory chain for its evaluation of her actions in dealing with the TSES Employee's disciplinary matter before publishing the Review.  Predictably, upon publication, Ms. Kerner was the subject of damaging media accounts and Congressional calls for her to be disciplined and removed from her position.

6.      When OIG published its Review on January 8, 2018, it did so in contravention of legal advice provided by Privacy Act subject matter experts (SMEs) in the DHS Office of General Counsel (OGC).  OGC SMEs warned the Office of Inspector General that the OIG SORN required OIG to obtain the approval of the DHS Chief Privacy Officer before publicly posting the Review.

7.      Under the OIG SORN, Routine Use N, OIG did not have the legal authority to release the OIG Review to the news media and the public on January 8, 2018, unless the DHS Chief Privacy Officer, in consultation with counsel, approved its release in advance.

8.      Pursuant to Routine Use N, it was the responsibility of the DHS Chief Privacy Officer— not the OIG—to determine in advance whether public release of information identifying Ms.

Kerner "would constitute an unwarranted invasion of personal privacy."  OIG proceeded on its own initiative to post the Review without approval by the DHS Chief Privacy Officer and in the absence of a pending Freedom of Information Act request.  Under Routine Use N, OIG did not have the legal authority to act as it did

9.      The unauthorized publication of this flawed OIG Report damaged Ms. Kerner's reputation and resulted in United States Senator Claire McCaskill publicly admonishing Ms. Kerner and calling for her removal as TSA Chief Counsel.  During a May 15, 2018, televised congressional hearing, Senate McCaskill pressed Secretary Kirstjen Nielsen to explain why Ms. Kerner still held her position as TSA Chief Counsel.

10.      After publication of the OIG Review, the leadership of DHS Office of General Counsel (to whom Ms. Kerner reports) evaluated the OIG Review and additional information, including relevant materials upon which the OIG had relied.  Based on its evaluation, the leadership of OGC determined that Ms. Kerner had acted appropriately to carry out her professional responsibilities as Chief Counsel; and that TSA senior leadership—not Ms. Kerner—made the decision to deviate from established TSA personnel policy and practice in order to ensure that the TSES Employee would be retained in federal service.  OGC also concluded that General Taylor had acted within the scope of his legal authority.

11.      A June 27, 2018, letter from the DHS Acting Assistant Secretary for Legislative Affairs (OLA) to Senator Claire McCaskill, then Ranking Member of the Homeland Security and Governmental Affairs Committee (HSGAC), conveyed OGC's conclusion that Chief Counsel Kerner had acted properly in connection with the TSES Employee's disciplinary matter.  Despite OGC's determination, OIG continues to post its Review, replete with material inaccuracies and omissions, despite Ms. Kerner's written requests for redress.

4

12. OIG has specific statutory responsibilities to ensure that Privacy Act violations do not occur at DHS. Under the Implementing Recommendations of the 9/11 Commission Act of 2007, codified at 6 U.S.C. §142, OIG is to work with the DHS Privacy Officer to ensure that personal information contained in Privacy Act systems of records is handled in full compliance with fair information practices as set out in the Privacy Act of 1974. This includes assuring the confidentiality, integrity and quality of the data. OIG's handling of its own Review did not meet these standards.

13. Therefore, Plaintiff brings this action to vindicate her rights under the Privacy Act and to recover damages of not less than $1,000, as well as reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552a(g)(1), 28 U.S.C. § 1331 and 5 U.S.C. § 706.

15. Venue is appropriate in the Eastern District of Virginia under 5 U.S.C. §§ 552a(g)(5), and 28 U.S.C. §§ 1391(b), and (e). Plaintiff works at the headquarters of TSA in Arlington, Virginia in this District, and a substantial part of the events or omissions giving rise to her claims occurred in this District.

## PARTIES

16. Plaintiff Francine Kerner is a citizen of the United States and resides in the State of Maryland. She serves as Chief Counsel for TSA where she has been employed since January 2002.

17. Chad F. Wolf is a Defendant in his official capacity as Acting Secretary of the Department of Homeland Security. DHS is headquartered in the District of Columbia, is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1) and is in possession and/or control

of records pertaining to Francine Kerner.

18.     Joseph V. Cuffari is a Defendant in his official capacity as Inspector General of the Department of Homeland Security.  OIG, headquartered in the District of Columbia, a part of DHS, is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1) and is in possession and/or control of records pertaining to Francine Kerner.  By statute, the DHS Inspector General ("IG") reports to the Secretary of Homeland Security.

## FACTS

### A.  TSA is Established to Oversee Transportation Security After the Terrorist Attacks of September 11, 2001

19.     After the terrorist attacks of September 11, 2001, Congress enacted the Aviation and Transportation Security Act, Pub. L. 107-71 (Nov. 19, 2001), (ATSA).  ATSA established the Transportation Security Administration (TSA) in the Department of Transportation (Transportation) to oversee transportation security in aviation and other modes of transportation.

20.     Under the Homeland Security Act of 2002, Pub. L. 107–296 (Nov. 25, 2002) TSA was transferred from Transportation to DHS.

21.     Every day, at about 450 domestic airports, TSA Transportation Security Officers conduct checkpoint security screening of more than two million passengers for prohibited items such as firearms and improvised explosive devices.

22.     The TSA is headed by an Administrator, who is appointed by the President with the advice and consent of the Senate.

23.     The TSA Administrator has broad authority regarding personnel management under ATSA as delegated to the Administrator by the Secretary of Homeland Security:  Delegation to the Administrator of the Transportation Security Administration, Delegation No. 7060.2 (Nov. 5,

2003).  The Administrator is authorized to appoint, transfer, and fix the compensation of such officers and employees as may be necessary to carry out the functions of the Administration.

24.     The TSA Transportation Security Executive Service (TSES) consists of TSA's executive-level staff who serve in key agency positions just below political appointees.

25.     For positions below the TSES, TSA uses an "SV" grading system, which is a pay banding system of grades that roughly correlate to GS grades 4-15. The SV grades, identified by letters A-M, have minimum and maximum pay rates, with M being the highest paid band.

26.     In June 2010, John Pistole, former Deputy Director of the Federal Bureau of Investigation, was appointed TSA Administrator.  That same year, Administrator Pistole created an Office of Professional Responsibility (OPR) through an internal management directive in order to provide greater consistency in misconduct penalty determinations around the country and a more expedient and standardized adjudication process.

27.     On December 31, 2014, Administrator Pistole retired from Federal service.  Thereafter, TSA Deputy Administrator ("DA") Melvin J. Carraway was designated Acting TSA Administrator.  Mark O. Hatfield, Jr.  assumed the responsibilities of Deputy Administrator.

**B.  TSA Conducts an Inquiry into Possible Misconduct by the TSES Employee and Transmits Its Report to the OPR for Appropriate Action**

28.     TSA has an Office of Inspection ("OOI") staffed with Special Agents to conduct criminal and administrative investigations into allegations against TSA employees, including TSES employees.

29.     On December 11, 2014, OOI received an anonymous complaint alleging that a TSES Employee had committed misconduct by engaging in inappropriate relationships and had violated TSA policies designed to ensure a competitive hiring process.  As an Assistant

Administrator, the accused TSES Employee was a member of TSA's Senior Leadership Team ("SLT") and reported to the Deputy Administrator of TSA. The TSES Employee had served in several TSES positions as the Deputy Assistant Administrator of the Office of Security Operations (OSO), the Deputy Assistant Administrator of the Office of Intelligence and Analysis ("OIA"), and the Assistant Administrator of the Office of Inspection before his assignment to serve as AA of OIA on December 1, 2014.  As Assistant Administrator of OIA, the TSES Employee also served as TSA's Key Intelligence Official ("KIO").  A former Marine, the TSES Employee had been lauded by prior TSA Administrator Kip Hawley for his efforts to help stand up TSA after the terrorist attacks of September 11, 2001, appearing in Mr. Hawley's book: *Permanent Emergency Inside the TSA and the Fight for the Future of American Security* (2012).

30.     OOI Special Agents conducted an administrative inquiry into the anonymous complaint against the TSES Employee.  During the course of the inquiry, Special Agents interviewed the TSES Employee, recording the interview.  The Special Agents had in their possession an email which the TSES Employee had sent to a female colleague (Jane Doe).  The email, sent off-duty between personal electronic devices, contained text of an explicit sexual nature.  At the time the email was sent to Jane Doe, the TSES Employee was not in her supervisory chain, but he did serve as her mentor.  Under questioning, the TSES Employee first denied he had sent Jane Doe anything of an explicit sexual nature, reversing himself only when shown the objectionable email.  As a former head of OOI, the TSES Employee understood that his lack of candor was a serious offense for which a removal from federal service might be warranted.

31.     OOI Special Agents also interviewed Jane Doe.  She was a close friend of the TSES Employee both at work and outside the office.  After she received the objectionable email, she

8

told the TSES Employee not to send her such an email again. He apologized and abided by her wishes. A former Federal Air Marshal, Jane Doe adamantly denied to OOI Special Agents that she was the victim of sexual harassment.

32.     The OOI investigation was completed on March 27, 2015.  OOI then prepared a Report of Investigation (OOI Report), which it referred on April 8, 2015, to TSA's OPR.

33.     In April 2015, OPR was headed by Assistant Administrator Heather Book.  Book began her career at TSA in 2003 as Senior Counsel in the Office of Chief Counsel ("OCC"). In 2006, she was promoted to the supervisory position of Assistant Chief Counsel Employment Litigation. In 2011, TSA selected Ms. Book to serve as Deputy Assistant Administrator for the OPR, a TSES position that made her a member of the SLT. In 2014, Ms. Book was named to lead OPR as its Assistant Administrator.  Having left TSA in 2016, she currently works at another federal agency.

34.     At OPR, the OOI Report on the TSES Employee was assigned to a K-Band Unit Chief (UC) who evaluated the case and prepared a draft Notice of Proposed Removal based on her assessment of the facts and the application of TSA's penalty determination factors.  Based on her assessment, the UC concluded that the TSES Employee had "no potential for rehabilitation."

35.     On April 28, 2015, Admiral Peter V. Neffenger, former Vice Commandant, was nominated by President Obama to be the next Senate confirmed TSA Administrator.

**C.  Chief Counsel Kerner and OCC SMEs Strengthen the Notice of Proposed Removal to be Served on the TSES Employee**

36.     On May 15, 2015, the UC sent the draft Notice of Proposed Removal (NPR) to OCC for legal review, copying AA Book.  OCC also obtained the OOI Report, including the audio of the TSES Employee's interview by OOI Special Agents, wherein he initially denied sending the

offending email.

37.     In May 2015, OCC was headed by Chief Counsel Kerner, a member of the TSES, who has served as TSA's Chief Counsel since its stand-up after the terrorist attacks of September 11, 2001.  A 1974 graduate of New York University School of Law, Ms. Kerner began her legal career as an Assistant District Attorney in the Kings County District Attorney's Office in Brooklyn, New York, working as a trial attorney in the Major Offenses Bureau before joining the Federal Government as Counsel to the Inspector General at the Department of Commerce in 1979.  During her 40-year career, she has managed legal programs and served as a member of the Senior Executive Service or its equivalent at the Departments of Commerce, the Treasury, Transportation and Homeland Security.  She served as the Deputy Assistant General Counsel for Enforcement at the Treasury before being asked to help stand up TSA after the enactment of ATSA. In 2001, Ms. Kerner received the Rank of Meritorious Executive in the Senior Executive Service from President Bush for sustained superior accomplishment in management of programs of the United States Government and for noteworthy achievement of quality and efficiency in the public service.  In 2013, after nomination by the DHS General Counsel, the D.C. Bar Association selected Ms. Kerner to receive the Beatrice Rosenberg Award for Excellence in Government Service based on her career accomplishments, outstanding performance as counsel to a government agency, exceptional service to the legal profession, and unselfish contributions to advance the careers of colleagues and junior lawyers.

38.     Chief Counsel Kerner and other OCC attorneys who specialize in handling disciplinary matters analyzed the materials relating to the TSES Employee's disciplinary matter. In reviewing the OOI Report, Ms. Kerner noted that on the date the TSES Employee had sent the inappropriate email to Jane Doe he had not been serving in her supervisory chain; however, he

had been serving as her mentor. At Ms. Kerner's direction, this information was woven into the proposal to demonstrate that as a mentor, the TSES Employee had "owed the Jane Doe a duty of care to serve as a role model and behave in a professional and appropriate manner," which he had demonstrably failed to do. Other revisions were made to the UC's draft NPR to strengthen it. The background section was expanded from four lines to three pages, providing a reader with a clear summary of the serious misconduct in which the TSES Employee had engaged. Anticipating litigation, misconduct charges were recast to ensure that the agency could meet its burden of proof easily in any subsequent legal challenge. As revised by OCC, the draft NPR contained four offenses: lack of candor; poor judgment; inappropriate conduct and unprofessional conduct. The conclusion of the OPR UC that the TSES Employee had "no potential for rehabilitation" was retained.

39.     On May 21, 2015, Admiral Neffenger had his Senate confirmation hearing for the position of TSA Administrator.

### C. OIG Covert Testing Results are Leaked to the Media; DHS Under Secretary for Intelligence and Analysis General Francis X. Taylor is Designated Acting TSA Administrator

40.     On June 1, 2015, negative results of DHS OIG covert tests performed at TSA airport security checkpoints under Inspector General John Roth were leaked to the media. A firestorm of adverse news coverage erupted. DHS Secretary Jeh Johnson took immediate action. Although TSA's next Administrator, Admiral Neffenger, was awaiting full Senate action after his May 21, 2015, Senate confirmation hearing, Secretary Johnson summarily reassigned Acting TSA Administrator Carraway to another position within DHS and designated the DHS Under Secretary for Intelligence and Analysis, General Francis X. Taylor, to serve as Acting TSA Administrator. Ironically, but for the leak of OIG audit results, General Taylor would not have

been at TSA to stop the proposed removal of the TSES Employee.

41.     General Taylor had held a variety of positions in the federal government and the private sector before being appointed by President Obama in April 2014 to serve as Under Secretary for Intelligence and Analysis.   As a Brigadier General in the Air Force, General Taylor had commanded the U.S. Air Force Office of Special Investigations (AFOSI).   As AFOSI's Commander, General Taylor ran a massive U.S. Federal law enforcement agency that reported directly to the Secretary of the Air Force and served as a field operating agency under the administrative guidance and oversight of the Inspector General of the Air Force.   In this role, General Taylor was responsible for managing the complex work of more than 2,000 military and civilian special agents, who conducted criminal investigative, counterintelligence and protective service operations worldwide.   He was highly experienced in evaluating misconduct and criminal wrongdoing.

42.     When serving as DHS Under Secretary for Intelligence and Analysis, General Taylor also functioned as the Department's Chief Intelligence Officer ("CINT"). In his capacity as CINT, General Taylor had responsibility for overseeing the work of all DHS component Key Intelligence Officials ("KIOs"). Pursuant to a DHS Management Directive, KIOs were designated by the Heads of their respective Components with the approval of the CINT and were accountable to their respective Component Heads and to the CINT for all Component Intelligence Enterprise activities.   As CINT, General Taylor oversaw the TSES Employee's work as TSA's KIO.

43.     General Taylor and the TSES Employee had a close working relationship.  The TSES Employee was one of the first people to welcome General Taylor to TSA in his new role as Acting Administrator.  On the morning of June 5, 2015, the TSES Employee advised General

Taylor that he had "set aside" an office for the General in TSA's intelligence facility and was "prepared" to provide him "with an Intel book" at TSA should he need it.  General Taylor thanked the TSES Employee and advised him that he "would like to see how we can incorporate some of your daily stuff into the S1 [DHS Secretary Jeh Johnson] Intel update as well as the CTAB [DHS Counterterrorism Advisory Board]." The General signed this email with his first name, "Frank." On the afternoon of June 5, the TSES Employee wrote to General Taylor, "This week, I provided a classified threat briefing to members of the Committee on Homeland Security which was well received. Below are some additional highlights for this week."  The highlights discussed in the email concerned "Risk Based Security," "Engagement," and "Efficiency & Effectiveness."  The TSES Employee ended his email with the following statement, "I, along with the men and women of OIA, welcome you to TSA and stand by to support you in your new role as the Acting Administrator of TSA. Have a great weekend. R/S, [TSES Employee]."  On the evening of June 5, General Taylor responded, "Impressive brief this morning."

44.     Of note, Deputy Administrator Mark Hatfield, who was the first-line supervisor of the TSES Employee, was copied on the email exchanges between the TSES Employee and General Taylor.  All three men had worked together on national security matters before General Taylor's arrival at TSA.

**D. General Taylor Directs that the TSES Employee, Whose Work He Has Overseen as Under Secretary, Not Be Removed from Federal Service**

45.     On or about June 8, 2015, OCC had completed its work on the draft NPR.  The draft NPR as revised by OCC was emailed back to AA Book on June 8, 2015.  Chief Counsel Kerner was copied on the transmittal email.

46.     But for direction received from General Taylor on June 12, 2015, the proposed removal

action against the TSES Employee would have proceeded in accordance with standard OPR procedures under the experienced management of career executives.

47.     The TSES Employee would have been served with the NPR, placed on paid administrative leave, and permitted to submit an oral and written reply to the OPR Deciding Official before a decision was rendered.

48.     Opportunity for an oral and written reply is a benefit extended to every employee facing serious disciplinary action in order to fulfill the requirement for due process.  In the course of replying to charges, the employee has the right to dispute the evidence against him and the offenses charged, and to seek mitigation of the penalty imposed by convincing the Deciding Official that he is remorseful and can be rehabilitated.  The decision on whether to reply to a proposed disciplinary action is within the sole discretion of an employee.

49.     An employee may also choose to forego reply and decide to settle a pending disciplinary matter on mutually agreeable terms.    Between 2013 and 2018, OPR's standard practice included the ability to enter into settlement agreements prior to a reply by the employee or prior to issuance of a decision by a Deciding Official.  Presented with the choice of fighting a proposed removal or accepting a demotion, an employee may decide to accept a settlement. This is what occurred in the TSES Employee's disciplinary matter as a result of General Taylor's intervention in the case.

50.     On Friday June 12, 2015, General Taylor held a meeting in his TSA Office to discuss the proposed removal against the TSES Employee. The meeting was attended by DA Hatfield, AA Book and Chief Counsel Kerner.  General Taylor started the June 12 meeting abruptly, demanding emphatically, "Don't I get a say?"

51.     Although there was no legal basis upon which to object to General Taylor's

involvement, during the course of the meeting advice was provided to General Taylor to follow the OPR process. General Taylor rejected this advice. He had the legal authority to do so. As Acting TSA Administrator, it was within General Taylor's plenary legal authority to make the decisions concerning (1) the disciplinary process to be followed and (2) the retention of the TSES Employee in federal service. Although the Administrator's authority on personnel matters, including discipline of TSES Employees, is delegated to various offices within TSA, including OPR, such delegation does not remove the authority from the purview of the Administrator.

52.     During the course of the June 12th meeting, Assistant Administrator Book voiced strong support for the proposed removal—rather than a lesser form of discipline—and advised General Taylor to let the OPR process run its course. She educated General Taylor on how the OPR process worked and the important reasons to follow the process. She explained to General Taylor that OPR had been established to provide equal treatment for all employees no matter how senior their position; and to insulate the front office from the decision-making process. She described how the OPR disciplinary process would proceed through a proposal, reply, and decision (which could be appealed). She noted that Deciding Officials often reduce the penalty during the final stage of review, so it was better for the proposal to put forward the highest supportable penalty. Ms. Book urged General Taylor to trust the OPR process.

53.     Ms. Kerner echoed AA Book's recommendation, asking General Taylor why the OPR process should not proceed. As Chief Counsel, Ms. Kerner's principal role was to advise on compliance with the law, legally available options, and legal risks associated with those options. Ms. Kerner, discussed litigation risk during the meeting and explained that TSA could settle the case at a later point if desired.

54.     Deputy Administrator Mark Hatfield ("Hatfield"), the first-line supervisor of the TSES Employee, did not support removal.  DA Hatfield expressed his concern that an OPR Deciding Official might impose a removal.  He believed the lack of candor charge was unfair because it was based on a trap set by the OOI investigators — *i.e.*, the investigators solicited a denial from the TSES Employee about sexually explicit communications with Jane Doe when the investigators had, in their possession, evidence of a sexually explicit communication.  DA Hatfield also felt the TSES Employee's long history of exemplary service with TSA warranted mitigation of the penalty.

55.     General Taylor stated that he had worked with the TSES Employee, thought highly of his work, and held him in high regard.  General Taylor's statements reflected the factors used by TSA to determine an appropriate disciplinary penalty. *See* TSA Handbook to Management Directive (MD) No. 1100.75-3, *Addressing Unacceptable Performance and Conduct*, (February 12, 2014) Section G. Penalty Determination.  He understood the facts of the case and considered the offense of the TSES Employee to be a "crime of emotion" and "an affair of the heart."  He believed the TSES Employee could be rehabilitated and directed that the TSES Employee not be removed from federal service.  Instead, the TSES Employee was to be relieved from command and penalized. The disciplinary matter was to be handled within the supervisory chain.  DA Hatfield was to be designated the Deciding Official with "certainty and speed" the goal.

56.     Rehabilitative potential is a primary factor in deciding whether to proceed with a removal or, in the alternative, a demotion. The OPR Unit Chief was not a member of the TSES and had not supervised the TSES Employee.  General Taylor was an executive and had overseen the work of the TSES Employee, which he valued. The General strongly believed that

the TSES Employee could be rehabilitated.

57.     Although not discussed at the meeting, Admiral Neffenger's confirmation hearing had occurred about three weeks earlier.

**E.  The NPR is Served on the TSES Employee and a Negotiated Settlement Approved by General Taylor Results in the TSES Employee's Reassignment, Demotion and Suspension**

58.     On Monday June 15, 2015, the Acting Deputy Assistant Administrator (ADAA) of OPR served the TSES Employee with a Notice of Proposed Removal.  The NPR served on the TSES Employee was the same document sent to OPR by OCC on June 8, 2015, except that DA Hatfield name had been substituted as the Deciding Official per General Taylor's direction.  In addition to the NPR, the ADAA provided the TSES Employee with a redacted version of the OOI Report, his most recent Performance Appraisal, referenced sections of the TSA Table of Penalties, and the audio recording of his interview by OOI Special Agents.  This provided the TSES Employee with all required documents should he consider it necessary to submit an oral or written response to the Deciding Official, or to appeal an adverse disciplinary action to the Merit Systems Protection Board (MSPB), the quasi-judicial agency that serves as the guardian of merit principles and adjudicates agency adverse decisions.

59.     Although General Taylor had directed that the TSES Employee be retained in federal service, serving the TSES with the NPR achieved several purposes.  As written, the NPR memorialized the factual and legal analysis performed by OPR and OCC, including Ms. Kerner, in the May/June time frame.  It represented a complete record of what the TSES Employee had done and why it was wrong.  By serving the NPR, TSA preserved its ability to defend any disciplinary action before the MSPB should an adverse action be imposed and the TSES Employee decide to exercise his appeal rights.  Additionally, serving the NPR achieved the legally permissible result sought by General Taylor (retain the TSES Employee but, hold him

accountable with significant discipline); while providing the Deciding Official with latitude to craft a possible settlement to avoid protracted litigation.  Absent a settlement agreement, the TSES Employee had the right to appeal to the MSPB not only a removal, but also a demotion, or suspension in excess of 14 days.

60.     Settlement of administrative personnel matters is widely favored throughout the Executive Branch.  In particular, the MSPB endorses many forms of alternative discipline, including settlement agreements, and has expressed that as a matter of public policy, it supports settlement agreements as a way of mutually resolving matters before an employee files an appeal.

61.     TSA Management Directive 1100.55-9, *Settlement Agreements* (Settlement Directive) expressly encourages the use of negotiated settlements to resolve disputes at the agency. Section 6.B. states, "[W]hen appropriate and mutually agreeable, TSA shall seek to resolve employee disputes such as complaints, grievances, appeals, litigation and other such actions through negotiated settlements with employees."

62.     The Chief Counsel also derives separate settlement authority from General Counsel Delegation # 0460.1, Issue Date: 11/03/2003 *Delegation to the Associate General Counsels, Chief Counsels, Legal Advisors and Judge Advocate General of the Coast Guard for Claims Resolution*, which covers personnel matters as well as other claims by or against the United States.  Shortly before the ADAA of OPR served the TSES Employee with the Notice of Proposed Removal, Chief Counsel Kerner sent the TSES Employee an email stating that she had spoken to DA Mark Hatfield and that she thought, "an agreement that would permit you to continue working at TSA can be reached."  Ms. Kerner also let the TSES Employee know that DA Hatfield wanted him to talk with a specific personnel attorney on her staff.  At the time she

sent the email, after 2:30 p.m., Ms. Kerner believed the NPR had already been served.  Early notification had no effect on settlement negotiations.

63.    After service of the NPR, the TSES Employee and DA Hatfield engaged in several days of negotiation, executing a settlement agreement on June 18, 2015, to which AA Book was also a signatory.  Acting TSA Administrator General Taylor approved settlement.

64.    Under the terms of the agreement the TSES Employee was demoted from the TSES, suspended for 14 days, and reassigned to an L-Band position in the Office of Security Operations (OSO) as deputy director in the business management office.  The demotion of the TSES Employee represented a diminution of responsibility and stature and halted the advancement of his federal career.  Although he retained his same salary under the terms of the settlement, his salary was capped well-below the top level of the TSES.  Of note, neither Chief Counsel Kerner nor General Taylor were consulted about pay retention.

65.    The penalty imposed under the settlement agreement was supported by the evidence, was reasonable, and had a sufficient nexus between a legitimate government interest and the misconduct that was the basis of the action.  Accordingly, the penalty was within the parameters of the TSA *Guidelines on Using the Table of Offenses and Penalties for Appropriate Discipline for Common Offenses* (TOP Guidelines), (May 15, 2014) and consistent with TSA's policies for addressing unacceptable conduct by employees, including members of the TSES.

66.    The first paragraph of the 2014 TOP Guidelines stated, "The Table of Offenses and Penalties is intended to provide **guidance** for determining appropriate corrective, disciplinary, or adverse actions for some common offenses.  It does not replace supervisory judgment for determining appropriate penalties in individual cases."

67.    The eighth paragraph of the 2014 TOP Guidelines stated, "A demotion may always be

19

considered as an option when the applicable penalty range includes removal."

68.     Lack of Candor, the most serious charge against the TSES Employee, carried an Aggravated Penalty Range of Removal and a Mitigated Penalty Range of a 14-day to 30-day suspension.  In this case, the TSES Employee received a penalty between the Aggravated and Mitigated Ranges.  This same penalty could have been imposed by a Deciding Official under the standard OPR process.

69.     In June 2015, after the signed settlement agreement had salvaged his federal career, the TSES Employee and General Taylor bumped into one another at TSA Headquarters. The TSES Employee apologized to General Taylor for his having to get involved. In turn, General Taylor offered words of encouragement to the TSES Employee, "We all make mistakes. Keep your chin up."

**F.  Congress Raises Questions about General Taylor's Disciplinary Decision; and DHS Senior Leadership Directs Administrator Neffenger to Send the Matter to Inspector General John Roth to Avoid the Need for General Taylor to Testify Before HOGR**

70.     On June 23, 2015, Admiral Neffenger was confirmed by the Senate as TSA Administrator.  He took office on July 6, 2015.

71.     Administrator Neffenger knew that General Taylor took responsibility for deviating from TSA's established OPR process and disallowing removal of the TSES Employee. On February 16, 2016, in response to questions about the case, Administrator Neffenger's Acting Assistant Administrator for Legislative Affairs wrote a letter to Congressman Chaffetz, Chairman, Committee on Oversight and Government Reform (HOGR); and the Ranking Member of HOGR Congressman Elijah Cummings to provide information.  As the letter explained, "[T]he most effective method of learning about the resolution of this case would be speaking with Ret. Gen. Francis X. Taylor, Department of Homeland Security Undersecretary

for Intelligence and Analysis, who served as the agency's helm and made the decision to remove, demote and reassign the former Assistant Administrator."

72.     In connection with questions from HOGR, Administrator Neffenger's Chief of Staff discussed the disciplinary action with General Taylor.  The Chief of Staff asked General Taylor why he had not chosen to follow the standard OPR disciplinary progress.  General Taylor explained that he had wanted to use a process with which he was comfortable.  He chose not to leave the disciplinary decision to others who sat outside the TSES Employee's supervisory chain of command.

73.     The Chief of Staff subsequently arranged a conference call between General Taylor and Congressional staff from the HOGR to discuss the handling of the case.  Questioned about his decision not to terminate the TSES Employee, General Taylor took responsibility for making the decision based on his own professional assessment.

74.     Congressional staff was not satisfied with General Taylor's explanation for his decision and called for him to testify before the Committee.  To prevent General Taylor from having to testify about his decision, "DHS senior leadership directed" Admiral Neffenger to refer the matter to Inspector General John Roth; which he did on April 28, 2016.  Admiral Neffenger explained this to Ms. Kerner when they spoke on September 11, 2018, during a commemorative ceremony at TSA headquarters, as he expressed regret about what had transpired after the OIG referral.  According to Admiral Neffenger, the Committee dropped its request for General Taylor to testify when advised that the matter had been referred to the OIG.  In fact, the referral to the OIG was the beginning of the effort to shift blame away from General Taylor for his decision.

**G. OIG Publishes a Deficient "Special Review" Designed to Shield General Taylor from Responsibility for his Disciplinary Decision, while Unfairly Shifting Blame for the Decision to Chief Counsel Kerner**

75.     Remarkably, in a patent attempt to absolve General Taylor of responsibility for his decision, the OIG Review posted on January 8, 2018, virtually wrote General Taylor out of the narrative.  Neither his name nor his pivotal role as the decision-maker were mentioned in the Review's distorted Executive Summary.

76.     In contrast, the Executive Summary stated that Chief Counsel Kerner had "deviated from" TSA policy and practice in order to provide the TSES Employee with "unusually favorable treatment;" using other pejorative terms to label as improper the legal advice and services she provided to TSA senior leadership who were acting within the scope of their authority.

77.     In creating its fictional narrative, the OIG Review was replete with material omissions and inaccuracies and put forth an incomplete and skewed recitation of the facts.

78.     An uninformed reader would have no idea that General Taylor and the TSES Employee had worked together prior to General Taylor intervening in the TSES Employee's disciplinary matter and deciding to mitigate the proposed removal to a lesser penalty.  The OIG Review omitted any mention of the significant working relationship between the two men despite the fact that Chief Counsel Kerner told OIG that at the June 12th meeting General Taylor had spoken about his work with the TSES Employee and said he held the TSES Employee in high regard.

79.     The OIG Review failed to state that General Taylor  knew the TSES Employee before he took the command at TSA; had a close working relationship with the TSES Employee protecting national security in their respective roles as CINT and KIO; oversaw the work of the

TSES Employee in his role as KIO; held the TSES Employee in high regard; expressed an understanding of the facts of the case; believed that the TSES Employee could be rehabilitated based on the facts and his knowledge of the TSES Employee; had years of experience overseeing and evaluating complex cases as Commander of AFOSI; received an explanation of the standard OPR process at the June 12th meeting in his office; rejected a recommendation from AA Book (supported by Ms. Kerner) to let the standard OPR process run its course; and relied on DA Hatfield as the Deciding Official in order to ensure that the TSES Employee would be retained in federal service in accordance with his direction.

80.     Including this information was critical to understanding General Taylor's motivation and his insistence on controlling how TSA proceeded in the disciplinary action.  Insofar as OIG withheld this essential information—and obfuscated General Taylor's role as the decision-maker—the Review lacked fundamental integrity.

81.     General Taylor decided to retain the TSES Employee in federal service based on his prior professional interactions with the TSES employee and his independent assessment of the facts.  He had the lawful authority to make this decision and to deviate from the standard OPR process in order to ensure his disciplinary decision to impose a less severe penalty than removal would be effectuated.  This is what occurred.

82.     The OIG Review also failed to state that prior to the June 12th meeting with General Taylor, Chief Counsel Kerner had evaluated the case relating to the misconduct of the TSES Employee, had determined there was sufficient evidence in the OOI Report to proceed with a proposed removal in accordance with standard OPR procedures, and had worked to strengthen the Notice of Proposed Removal should an imposed adverse action be appealed to MSPB.  Her actions demonstrated, contrary to the narrative of the OIG Review, that she was not affording

the TSES Employee "unusually favorable treatment," nor was she attempting to circumvent the standard OPR process.  The June 8, 2015 NPR reflects her position on the case prior to intervention by General Taylor.

83.     In its discussion of the NPR, the OIG Review failed to compare the draft NPR that the UC sent to OCC on May 15, 2015, with the rewritten NPR that Ms. Kerner and OCC staff prepared and sent back to OPR on June 8, 2015.  In discounting OCC's work, the OIG Review attributed to the Unit Chief the document substantively drafted by OCC.  In fact, it was OCC's version of the NPR that was served on the TSES Employee on June 15, 2015.  The only change was the substitution of DA Hatfield as the Deciding Official at the direction of General Taylor.

84.     The OIG Review stated that Acting TSA Administrator General Taylor was unfamiliar with TSA's disciplinary practices and procedures.  But it failed to report that he received information about its practices and procedures from AA Book.  At the June 12th meeting, AA Book described the OPR process to General Taylor, explained the reasons why OPR had been established, and recommended that General Taylor let the OPR process run its course.

85.     AA Book was interviewed on the telephone by an OIG investigator for about 30 minutes. She told the OIG investigator that she had explained to General Taylor why OPR had been established and the important role it played with regard to ensuring consistency in discipline. She told the OIG investigator that she had described to General Taylor how the OPR process worked, that she had recommended following the OPR process, and that Chief Counsel Kerner had supported her recommendation.  All of this was omitted from the OIG Review.  By omitting AA Book's explanation from the Review, OIG selectively manipulated the narrative to support its desired conclusion that General Taylor was uninformed and that any criticism of or fault in the disciplinary process regarding the TSES Employee was directed at someone other than General

Taylor.  The OIG unfoundedly determined that Chief Counsel Kerner would be that scapegoat.

86.     Despite the OIG Review's assertion to the contrary, General Taylor's involvement in a personnel action involving a member of the SLT was neither a historical anomaly nor extremely unusual.   During her January 5, 2017 interview with OIG, Ms. Kerner specifically advised investigators that—to the best of her knowledge—the TSA front office had provided input on the final determination of all disciplinary matters involving members of the Senior Leadership Team.  Her statement was purposely omitted from the OIG Review.

87.     During the tenure of Administrator Pistole (who had established the OPR), Front Office involvement in disciplinary matters included two SLT cases:  a settlement agreement involving inappropriate conduct by an Assistant Administrator; and a settlement agreement involving inappropriate conduct by the Director of the Federal Air Marshal Service.  In both cases, action by OPR was held in abeyance as a result of the settlement agreements. Content of the settlement agreements was determined by Deputy Administrator John Halinski, who signed both agreements on behalf of TSA; the first in 2013 and the second in 2014.

88.     Administrator Neffenger—who referred the TSES Employee's disciplinary matter to OIG for review at the direction of DHS senior leadership—had himself personally directed OPR to retain in federal service a member of the SLT rather than complete a pending removal action.  Driving while intoxicated, the Deputy Assistant Administrator had collided with several parked cars.  Getting out from behind the driver's wheel and moving to the passenger's seat, the Deputy Assistant Administrator had initially lied to police, identifying another person (a TSA stakeholder) as having been the driver of the car.  Administrator Neffenger felt that the Deputy Assistant Administrator's statements were attributable to intoxication and noted the Deputy Assistant Administrator had told the police the truth when the after-effects of alcohol had worn

25

off.   Administrator Neffenger accepted the recommendation of the Deputy Assistant Administrator's supervisory chain, including DA Hatfield, that the Deputy Assistant Administrator not be removed from Federal service.   Thereafter, AA Book signed a settlement agreement with the Deputy Assistant Administrator in 2015, imposing a 14-day suspension.

89.     With regard to negotiated settlements, the OIG Review dismissed their use, stating that after the establishment of OPR, the "practice appears to have been discontinued."  This was not an accurate statement.   OPR continued to utilize negotiated settlements.   Between 2013 and 2018, OPR's standard practice included the ability to enter into settlement agreements prior to a reply by the employee or prior to issuance of a decision by a Deciding Official.   Moreover, this practice was not limited to members of senior leadership but was utilized for a wide range of pay levels under OPR's jurisdiction, from I-Band employees up to TSES.   Between April 2013 and January 2018, 21 disciplinary matters pending in OPR were concluded with a settlement agreement between the employee and TSA before a decision was issued by an OPR Deciding Official.   Thirteen of the settlements during this period occurred before the TSA employee submitted a reply to the charges.   The signatory for TSA was most often the AA of OPR; almost all the settlements involved assistance from OCC.

90.     In its Review, OIG also asserted that OCC had failed to comply with the TSA Settlement Directive by not consulting the TSA Executive Resources Council (ERC) on the TSES Employee's settlement agreement and labeled this another action by Ms. Kerner to "undermine the purpose and function of OPR."  This was accurate.   Between March 2013 and February 2018, there were 12 TSA settlements with TSES or Executive Level Employees involving EEO, performance or disciplinary matters.   Not a single one of these settlements included a formal ERC consultation. Having never consulted the ERC about any settlement, the absence of

consultation cannot be viewed as "circumventing" an established process in favor of the TSES Employee or undermining the purpose and function of OPR.

91.     Language concerning ERC consultation had been added to the Settlement Directive on February 25, 2013 by an Assistant Administrator of OHC who left TSA that same year.  As a practical matter, the provision on consultation was not implemented.  On February 10, 2014, TSA Administrator Pistole approved an updated ERC Charter. The updated February 2014 Charter contained no language providing authority to the ERC to review or approve settlement agreements. As explained in the 2014 Charter, the purpose of the ERC was "to advise the Administrator and Deputy Administrator concerning the recruitment, assessment and selection of executives, their compensation and benefit packages, the executive performance, management and awards process, and the certification of professional development activities to strengthen the executive cadre at TSA."   Additionally, the Deputy Administrator was named as a permanent member of the ERC and its designated Chair.

92.     Additionally, the 2013 revision to the Settlement Directive was silent on how consultation or coordination with the ERC was to have been achieved.  OCC was not authorized to convene the ERC.  Notification and consultation to the Chair of the ERC was consistent with the intent of the Directive, which did not itself prescribe procedures on consultation nor prohibit consultation with the Chair as satisfying the consultation requirement. OCC would have met any obligation it had under the revised Directive by working with DA Hatfield, who was the Chair of the ERC and the intended recipient of its advice related to employees in the TSES or Executive positions. As Chair of the ERC, DA Hatfield could have convened a meeting of the ERC to obtain its advice on the TSES Employee settlement had he thought such advice "necessary." Further, the Deputy Administrator was well aware of TSES Employee's past work experience at TSA and

his qualifications for the position of deputy director, in the business management office in OSO. At no time did DA Hatfield convene the full ERC for advice on this case.  Nor was that TSA practice at the time.

93.    DHS Deputy General Counsel Maher also conducted a legal review of the ERC governance documents. Analyzing the language in the 2013 Settlement Directive relating to the ERC and the 2014 Charter issued by Administrator Pistole defining its scope of work, Mr. Maher concluded that neither the Directive nor the Charter required the ERC's approval, review, or consultation on disciplinary matters.  Mr. Maher also expressed his concern that OIG had taken no action to identify whether settlement agreements had in fact been presented to the ERC. As noted above, settlement agreements had not been presented to the ERC.

**H.  OIG Decisions to Conduct a Truncated Inquiry and to Publicly Release an Untested Special Review Denied Chief Counsel Kerner Due Process and Violated Her Privacy Act Rights**

94.    The Inspector General Reform Act of 2008 (IG Reform Act) provides that members of the Council of the Inspectors General on Integrity and Efficiency (CIGIE) "shall adhere to professional standards developed by the Council" (§ 11(c)(2) of the IG Reform Act).  The Inspector General of the Department of Homeland Security is a member of the CIGIE.

95.    On November 15, 2011, the CIGIE published *Quality Standards for Investigations* (2011) https://www.ignet.gov/sites/default/files/files/invprg1211appi.pdf ("Standards").  The Standards require that inquiries must be conducted with "due professional care."

96.    In accordance with the Standards, OIGs are to be cognizant of factors that may restrict their ability to conduct an independent and objective investigation. Such factors include, "Influence on the extent and thoroughness of the investigative scope, the way in which the investigation is conducted, the individual(s) who should be interviewed, the evidence that should

be obtained, and the content of the investigative report." Standards at 7.  Due professional care requires thoroughness, impartiality and objectivity: "All investigations must be conducted in a diligent and complete manner, and reasonable steps should be taken to ensure that pertinent issues are sufficiently resolved." *Id.* at 8. Additionally, "All investigations must be conducted in a fair and equitable manner, with the perseverance necessary to determine the facts." *Id.* Of significance, "Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue.  This includes inculpatory and exculpatory information." *Id.*   By these standards, the OIG Review was deficient.

97.     In November 2017, Inspector General John Roth gave a radio interview to the Federal News Network in which he explained that he had established a new unit called the Special Review Group as part of the Office of Counsel to serve as a small, rapid response team to look at issues over the course of three-to-six weeks, for fast-moving, short-term projects.

98.     The OIG Special Review posted on January 8, 2018 was conducted by this unit.  In conducting its Special Review and posting the results on January 8, 2018, the OIG did not adhere to the CIGIE Standards.

99.     With respect to the Review, OIG abandoned the safeguards associated with a formal investigation.  Sworn witness statements were not obtained.  Information provided to OIG investigators by Ms. Kerner and Ms. Book that did not support the OIG narrative was not included in the published Review.  Discrepancies among witnesses were not resolved.  After initial interviews, OIG investigators did not return to neither Ms. Kerner or Ms. Book to ask any follow-up questions.  Legal interpretations of the Settlement Directive and governing ERC charter were not obtained.  Actual TSA practices regarding the use of settlements and the role of

the ERC were not verified.  Ms. Kerner's supervisory chain was not presented with a Report on Investigation for their assessment prior to publication of the Review.  They were not provided an opportunity to evaluate the facts presented, obtain input from Ms. Kerner, and determine whether Ms. Kerner had performed her duties and responsibilities as Chief Counsel appropriately and without favoritism.   Finally, OIG failed to provide Ms. Kerner with an opportunity to examine the draft OIG Review for accuracy and submit feedback prior to publication.  Not only did OIG's failures violate the Privacy Act and related regulations and procedures, OIG failed to provide Ms. Kerner fundamental due process.

100.    Indeed, Inspector General Roth took affirmative steps to keep Ms. Kerner from reading the Review before it was published.  On November 30, 2017 (on what was reported to be his last day in the office before his retirement from Federal service), IG Roth sent Administrator Pekoske a draft of the OIG Review with a transmittal memorandum.   Regarding Chief Counsel Kerner, IG Roth specifically counseled, "Given the involvement of TSA's Chief Counsel, Francine Kerner, in this matter, DHS OIG strongly suggests that Chief Counsel Kerner be walled off from the report review and redaction request process to avoid the appearance of a conflict of interest and ensure agency objectivity." IG Roth went on to say, "I will personally review each redaction request and weigh the gravity of the potential harm against the importance of releasing the information."

101.    Inspector General Roth's transmittal memorandum raises questions about the OIG's motivations.  First, Inspector General Roth was personally familiar with Chief Counsel Kerner because she had previously challenged portions of two OIG audits—challenges that Roth did not take well.   Second, OIG had been advised by OGC subject matter experts that pursuant to the OIG SORN, OIG did not have the legal authority to publish the OIG Review without first

obtaining the approval of the DHS Chief Privacy Officer, which they had not done. Additionally, OGC advised that premature publication of the Review with references to Ms. Kerner would constitute a violation of her rights under the Privacy Act because she had yet to be afforded due process, citing applicable case law.

102.   Despite this admonitory legal advice, OIG defiantly proceeded to post its Review on its website without providing Ms. Kerner due process and in violation of the DHS OIG SORN.  A footnote on the first page of the posted January 8, 2018 OIG Review contained the following statement: "DHS OIG has determined that, in light of the particular issues raised in this report, the public interest in disclosure outweighs the personal privacy interests of certain of the individuals referenced herein.  Accordingly, because significant public benefit would result from disclosure of the information contained in this report, DHS OIG has left unredacted the names of certain individuals associated with this matter."  Under the Routine Use N in the OIG SORN published by the Office of the Secretary DHS Privacy Office, OIG did not have the legal authority to make this determination.

103.   Previously, Chief Counsel Kerner had other interactions with OIG on audits involving TSA.  Following the June 1, 2015, leak to the media of OIG covert testing results at TSA airport security checkpoints, teams from OIG and TSA, including both IG Roth and Chief Counsel Kerner, met at TSA to discuss the results.  Ms. Kerner asked Inspector General Roth how he could consider particular testing results valid given the use of certain test items.  He voiced a sharp rejoinder, asserting in front of the group that it made "no difference" to the results. Factually, this was incorrect and other meeting participants knew it.

104.   In a second audit, after TSA had non-concurred with an OIG recommendation concerning CCTV at a New York airport, Mr. Roth specifically criticized Chief Counsel Kerner's legal

position as "post-hoc" and "irrelevant." His view, expressed in an April 2016 memorandum to the DHS Under Secretary for Management set forth his position that CCTV owned and operated by an airport authority be treated by TSA as a DHS IT system. The Under Secretary of Management invited Chief Counsel Kerner to a small meeting in his office to discuss the OIG audit recommendation on CCTV. As an aside, the Deputy Under Secretary for Management noted his wonder to Ms. Kerner that Inspector General Roth was so personally focused on the issue. Subsequently, on January 19, 2017, DHS adopted TSA's position, providing a waiver pursuant to which airport CCTV did not need to be treated as a DHS IT system. The DHS waiver drew upon the arguments that had been made by Chief Counsel Kerner. The waiver was issued 12 days after Ms. Kerner had been interviewed by OIG in connection with the TSES Employee's disciplinary matter.

105.   When published on January 8, 2017, the OIG Review resulted in news coverage by *USA TODAY* and other media that tarnished Ms. Kerner's reputation as TSA Chief Counsel. In contrast, General Taylor was regarded as without blame: his identity as decision-maker having been effectively masked by OIG. Most articles did not mention him at all.

106.   On February 26, 2018, Senator Ron Johnson, Chairman, Committee on Senate Homeland Security and Governmental Affairs, and Senator Claire McCaskill, then its Ranking Member, jointly signed a letter to TSA Administrator David Pekoske, asking the Administrator to "describe the disciplinary actions taken by TSA to address OIG's findings regarding the senior leaders who involved themselves in the adjudication of the [T]SES's personnel matter." On May 15, 2018, at a televised hearing of the Committee, Senator McCaskill questioned Secretary Kirstjen Nielsen about the OIG Review and asked why the Department had not taken action against the Chief Counsel. Secretary Nielsen promised to look

into the matter and get back to the Senator. That day, Stephanie Beasley of *Politico* reported that Senator McCaskill was "baffled" about why no action had been taken against Chief Counsel Kerner, stating her "worry" that "we've put the fox in charge of the hen house."

107.    After OIG posted the Review on its website, the leadership of OGC, to whom Chief Counsel Kerner reports, undertook its own assessment of the Review.  In the course of reviewing the OIG Review and additional information (including the relevant materials upon which the OIG Review relied), the leadership of the Office of General Counsel found no basis to conclude that Ms. Kerner failed to perform her professional duties or that she engaged in misconduct of any kind.  Further OGC concluded that "TSA's senior leadership—not Ms. Kerner—made the decision to deviate from established TSA Office of Professional Responsibility processes." OGC determined further, "TSA's senior leadership's decision in this regard was lawful, and the OIG report did not find otherwise."  DHS OLA conveyed these conclusions on behalf of the Department in a June 27, 2018 letter to the Ranking Member of HSGAC, Senator McCaskill.

108.    Subsequently, on September 24, 2018, Chief Counsel Kerner received a memorandum from the Principal Deputy General Counsel Joseph B. Maher (now Acting General Counsel) analyzing the Ms. Kerner's handling of the TSES Employee disciplinary matter.  Mr. Maher found "no basis to conclude" that Ms. Kerner engaged in misconduct or failed to perform duties consistent with her professional obligations. With TSA leadership seeking "certainty and speed," in resolving the case, settlement was offered "as a means of accomplishing General Taylor's intention of less severe discipline for the TSES Employee" at the same time "securing significant discipline—without the threat of protracted litigation—for the TSES Employee." Given the nature of the TSES Employee's misconduct, Mr. Maher emphasized, "The report does not find that the penalty imposed in the settlement agreement

was more lenient than the discipline received by others in comparable situations, or that the penalty imposed was inadequate to remedy the misconduct." Having reviewed ERC materials, Mr. Maher concluded that TSA's Executive Resources Council did not need to be consulted on a settlement involving a disciplinary matter; and noted that OIG had not analyzed TSA's practices.

109.    Although TSA senior leadership would not permit a removal action to proceed to conclusion, Chief Counsel Kerner's efforts resulted in the TSES Employee being issued the NPR; and thereafter, being demoted, suspended and reassigned to a subordinate position as a deputy director in a business management office pursuant to a negotiated settlement that carried out General Taylor's expressed goals and which he himself approved.   It was a stiff penalty that derailed the trajectory of the TSES Employee's federal career and brought him ignominy.  Chief Counsel Kerner should not have been unfairly pilloried for achieving this legally permissible outcome at the direction of the TSES Employee's supervisory chain.

110.    OIG's unlawful posting of the OIG Review has caused Ms. Kerner significant harm and financial loss in the form of: (a) permanent loss of earning capacity due to reputational damage; (b) attorneys' fees relating to attempts to obtain redress from the DHS Office of Inspector General; and (c) the cost of therapy to cope with anger and anxiety caused by the unlawful publication of the OIG Review to the news media and public on January 8, 2015, and her recognition that she was made a scapegoat to protect the reputation of General Taylor.

111.    On October 18, 2019, counsel for Ms. Kerner wrote to DHS Inspector General Joseph V. Cuffari, with copy to DHS FOIA Public Liaison, requesting correction to the OIG Review to remove the unfounded and disparaging statements regarding Ms. Kerner.  As of this date, there has been no response to this correspondence.

112.    Plaintiff sues DHS and OIG, in their capacity as agencies, for actual damages sustained by Plaintiff and reasonable attorney's fees and costs, as provided for in 5 U.S.C.§ 552a(g)(4).

## COUNT ONE

### Violation of the Privacy Act (5 U.S.C. §§ 552a(b), (g)(1)(D)): Disclosure of Records to the News Media and the Public in Violation of the Applicable OIG SORN

113.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

114.    Defendants DHS and OIG are "agenc[ies]" within the meaning of the Privacy Act and maintain a relevant "system[s] of records" as defined in the Privacy Act, 5 U.S.C. § 552a(a)(5), *See also* DHS/OIG-002 Investigative Records System, 80 FR 44372 (July 27, 2015), http://www.gpo.gov/fdsys/pkg/FR-2015-07-27/html/2015-18385.htm.   At all relevant times, the relevant "system[s] of records" contained "record[s]," as defined in 5 U.S.C. § 552a(a)(4), that pertain to and are about Plaintiff, including the OIG Review posted to the OIG's website on January 8, 2018 and related materials.

115.    The Privacy Act states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains unless disclosure of the record would be. . . .(3) for a routine use as defined in subsection (a)(7) of this section and described under the subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b).

116.    The Act provides a private cause of action "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D).

117.    Routine Use N of the OIG SORN permits release of investigative records to the public and news media, but only if the DHS Chief Privacy Officer in consultation with counsel, approves in advance and makes a determination that release of specific information in the context of a particular case would not constitute unwarranted invasion of personal privacy. Routine Use N in the OIG SORN reads as follows:

> N.  To the news media and the public, with the approval of the Chief  Privacy Officer in consultation with counsel, when there exists a legitimate public interest in the disclosure of the information or when disclosure is necessary to preserve confidence in the integrity of DHS, or is necessary to demonstrate the accountability of DHS's officers, employees, or individuals covered by the system, except to the extent the Chief Privacy Officer determines that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy.

OIG did not obtain approval from the DHS Chief Privacy Officer to post the OIG Review to its public website.   In so doing, OIG willfully and intentionally failed to comply with the requirements of the applicable OIG SORN, Routine Use N.  A footnote on page 1 of the OIG Review stated:

> DHS OIG has determined that, in light of the particular issues in this report, the public interest in disclosure outweighs the personal privacy interests of certain of the individuals referenced herein.  Accordingly, because significant public benefit would result from disclosure of the information contained in this report, DHS OIG has left unredacted the names of certain individuals associated with this matter.

OIG did not have the legal authority to make this determination and were so advised by legal experts in the Office of General Counsel prior to the Review's public release.  Proceeding with publication of the Review in contravention of legal advice was a cavalier abuse of authority.

118.    The independence of the Inspector General to investigate and then report its investigative results to appropriate government officials does not provide OIG with the unfettered authority to ignore the requirements of the Privacy Act in releasing publicly—on its own initiative—investigative findings in violation of statute, regulation, and applicable case law.  Nor is there any Privacy Act provision permitting an agency to disclose records to the media or the public on the basis that the agency has already provided, or plans to provide, the same records to Congress.

119.    Although the Privacy Act excepts from its coverage disclosure of a record that would be required to be released under the Freedom of Information Act (FOIA) 5 U.S.C § 552, this exception does not come into play unless an agency is faced with a FOIA request for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information.  As it relates to Ms. Kerner, a FOIA exemption would have applied on January 8, 2018 because she had yet to be afforded her elemental right to due process.  OIG had not provided Ms. Kerner with an opportunity to examine its Review and submit feedback. Moreover, her supervisory chain had not been provided with the Review and supporting materials for its evaluation; nor had they been given the necessary time to seek Ms. Kerner's input.  Under the circumstances, any public release of information "could reasonably be expected to constitute an unwarranted invasion of personal privacy" and would have been premature.  When Chief Counsel Kerner's supervisory chain did finally get an opportunity to conduct its own review, they exonerated Ms. Kerner and concluded that she had acted in good faith to meet her professional obligations and carry out the lawful direction of General Taylor.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against Defendants and that the Court grant the following:

a.   award Plaintiff actual damages as provided for in the Privacy Act, 5 U.S.C.

§ 552a(g)(4)(A), the exact amount of which is to be determined at trial, but which is not less than $1,000;

b.   award Plaintiff reasonable attorneys' fees and costs, as provided for in 5 U.S.C. § 552a(g)(4)(B);

c.   invoke its equitable powers to expunge all references to Chief Counsel Kerner or the TSA Office of Chief Counsel; and

d.   any such other and further relief as this Court deems just.


Dated: January 6, 2019            /s/
                                   David Alan Warrington (VSB# 72293)
                                   KUTAK ROCK, LLP
                                   1625 Eye Street, NW, Suite 800
                                   Washington, D.C. 20006
                                   Telephone: (202) 828-2437
                                   Facsimile: (202) 828-2488
                                   Email: david.warrington@kutakrock.com